**Opinion issued June 23, 2022.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

## NO. 01-22-00001-CV

————————————

## IN THE INTEREST OF M.K.E. AKA M.K.E., AKA M.E., AKA M.E., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-02300J**

---

## MEMORANDUM OPINION

J.L.C.F. ("Mother") appeals the trial court's order terminating her parental rights to her minor child M.K.E. aka M.K.E., aka M.E, aka M.E. ("Matthew"). In her sole issue, Mother argues there is factually insufficient evidence supporting the trial court's finding that termination of her parental rights is in Matthew's best interest. We affirm the trial court's decree of termination.

## Background

On December 8, 2020, the Department of Family Protective Services ("Department") filed a petition seeking managing conservatorship over Matthew and termination of Mother's and G.E.'s ("Father") parental rights to the child.[1]   In the removal affidavit attached to the petition, Darius Pruitt ("Pruitt"), a Child Protective Services ("CPS") Investigator, averred that the Department had received a referral for neglectful supervision of Matthew after Mother and Matthew tested positive for amphetamines[2] when Matthew was born in early December 2020.

Pruitt met with Mother and Father at the hospital the day Matthew was born. When asked about the amphetamines found in her system, Mother explained she had been taking pain medication. She admitted, however, that the medication had not been prescribed to her and she had acquired the medication from someone she did not know. Mother denied taking any other drugs. She also told Pruitt that she had marijuana in her system when she gave birth to Matthew's stepsister, Amy, in 2005 and that Mother's aunt has custody of the girl.[3]   Mother stated that, other than the pain medication, she had not used drugs since that time. Father told Pruitt he did not

---

[1]   To protect the identity of the minor child, we will refer to him by pseudonym and we will refer to his biological parents as Mother and Father. *See* TEX. R. APP. P. 9.8.

[2]   Matthew's case worker testified that Matthew and Mother tested positive for methamphetamines when he was born.

[3]   For purposes of this opinion, we will refer to Matthew's stepsisters by pseudonym.

live with Mother and he never saw her use drugs. He also acknowledged he had a criminal history for traffic tickets, domestic violence, and drug possession.

Pruitt also spoke to nurse Sandy Kattner ("Kattner") and social worker Vanesa Villia ("Villia") at the hospital. Kattner confirmed that Mother and Matthew tested positive for amphetamines. She told Pruitt that although Mother had admitted to taking painkillers during her pregnancy, she refused to take pain medications during Matthew's birth. Kattner stated that Mother appeared to be "high on something" and kept falling asleep while she was at the hospital, including while she was giving birth to Matthew. According to Kattner, Father fed Matthew a bottle because Mother kept falling asleep. Villia, the social worker, told Pruitt that Matthew needed to stay in the hospital for a few days where he could be monitored for any withdrawal symptoms.

Pruitt stated that he contacted the two kinship placements Mother and Father suggested. One relative was not a suitable placement because she had a recent history with Adult Protective Services ("APS") and the other proposed placement was no longer willing to take care of Matthew. Pruitt also averred that in 2005, Mother was referred to the Department for physical abuse of her daughter, Amy, because Mother tested positive for cocaine, amphetamines, benzodiazepines, and PCP when Amy was born. As a result of the referral, Amy and her older sister, Zoe, were taken into the Department's care. Mother's parental rights to both girls were

3

terminated in 2006 after Mother signed an affidavit of voluntary relinquishment. Amy was ultimately adopted, and Zoe's maternal grandmother was named as her permanent managing conservator.

Pruitt's removal affidavit also includes Mother's criminal history. In 2016, Mother pleaded guilty to the state jail felony offense of possession of methamphetamine, and she was sentenced to 6 months in TDCJ's state jail division. In 2000, Mother pleaded guilty to the misdemeanor offense of possession of marijuana, and she was sentenced to 20 days in jail. In 2009, Mother was convicted of sale of alcohol to a minor, for which she was sentenced to 15 days in county jail, and failure to show identification, for which she was sentenced to 10 days in county jail. In 1999, Mother was convicted of the misdemeanor offenses of theft and unlawfully carrying a weapon and sentenced to 80 days in county jail.[4]

The trial court granted the Department's emergency request for temporary managing conservatorship of Matthew on December 8, 2020, the day the Department filed its petition. On December 29, 2020, the trial court held an adversary hearing which Mother did not attend in person. The court also issued a temporary order continuing the Department's appointment as Matthew's temporary managing conservator. The temporary order advised Mother that to regain

---

[4] The removal affidavit also documented Father's extensive criminal history, including charges involving injury to a child, terroristic threat, assault of a family member two times, assault causing bodily injury, and drug possession.

possession of Matthew, she had to comply with the actions set forth in the order. The order warned Mother that failure to comply could result in termination of her parental rights to Matthew. Among other things, the order required Mother to provide the Department with her current address and phone number and the name and contact information of any relative with whom the Department could place Matthew while the suit was pending. Mother was also required to provide proof of income within 30 days of the hearing.

On January 22, 2021, Mother's family service plan was filed with the trial court. Mother's family service plan required her to, among other things: (1) provide verifiable proof of income, (2) obtain and maintain suitable housing that was clean, stable, and free from safety hazards, (3) actively participate in all permanency conferences and court hearings, (4) successfully submit to random drug testing as requested by the Department's caseworker, (5) provide the Department with verifiable proof of participation in a Narcotics Anonymous ("NA") or Alcoholics Anonymous ("AA") 12-step program, (6) obtain a sponsor who has been sober for more than five years, (7) attend, participate, and successfully complete a drug/alcohol assessment, (8) submit to psychological and psychosocial evaluations, and (9) attend, participate in, and successfully complete parenting classes. The service plan stated that if Mother did not show up for a scheduled drug test, the Department would consider her failure to appear as a positive test result.

Mother's service plan states that she has support from her oldest daughter, Zoe, and Mother's two sisters with whom Mother lives from time to time. Mother, who had been living in Austin, returned to Houston to help care for her elderly mother who passed away a year earlier. Mother reported that she was currently staying in her mother's home, which she and one of her sisters had inherited when their mother died. Mother also told the Department that she was unemployed and would start looking for employment once she found out "where she was going to live." Mother claimed that she had been sober for ten years and did not relapse until she took a pain pill for a toothache right before Matthew was born.

According to Mother's family service plan, the Department was concerned about Mother's ability to care for Matthew because (1) Matthew had tested positive for amphetamines at birth, (2) Mother had prior CPS cases involving substance abuse, (3) Mother was currently homeless and did not have a stable home for Matthew, (4) Mother had a history of substance abuse, and (5) Mother had a criminal history.

After a status hearing on February 3, 2021, the trial court issued an order approving Mother's family service plan and incorporating the plan into the order. The order stated that Mother understood her family service plan and had been advised that unless she was willing and able to provide Matthew with a safe environment, her parental rights could be restricted or terminated.

On May 5, 2021, the court held a permanency hearing which Mother did not attend. After the hearing, the trial court issued an order finding that Mother had not demonstrated adequate and appropriate compliance with her service plan.

In August 2021, the Department filed a permanency report with the court stating that Matthew, who was then 8 months old, was happy, healthy, and hitting all age-appropriate milestones while in his foster placement. With respect to a possible kinship placement, the Department reported that a home study had been requested for Zoe, Mother's oldest daughter. The Department, however, had been unable to conduct a home study for Mother's sister, Chasta, because Mother and Chasta had been living in the same house.

The Department reported that although Mother had attended visits with Matthew, she was not participating in her court-ordered services. Specifically, Mother had not reported for drug tests in February, March, April, May, June, and July 2021, she was not making progress toward her substance abuse goals, and she had been discharged from a substance abuse program in May 2021. Mother, who was also unemployed, had not provided the Department with proof of housing as required by her service plan.

On September 1, 2021, Mother and her sister, Chasta, attended the second permanency hearing in this suit. After the hearing, the trial court issued an order finding that Mother had not demonstrated adequate and appropriate compliance with

her service plan. The trial court also ordered the Department to conduct an expedited home study on Chasta within 30 days.

Trial commenced on November 9, 2021. Mother, Father, Matthew's foster mother, and Matthew's case worker, Mitzi Arsola ("Arsola"), testified at trial.

## A. Arsola's Testimony – Caseworker

Arsola testified that she had been Matthew's caseworker since February 2021. Matthew was eleven months old at the time of trial and had been living in a foster-to-adopt placement since he was only a few days old. According to Arsola, Matthew was doing well in his foster placement and hitting all his milestones. She reported that Matthew was crawling, attempting to walk, pulling himself up, and becoming very active. Arsola testified that Matthew's foster parents play with him and read to him during her monthly visits. According to Arsola, Matthew is "very bonded" with his foster family. He smiles at them and enjoys being held by them. Arsola confirmed that Matthew's foster parents are willing to adopt him.

According to Arsola, the foster parents' home is very appropriate and located in a nice, "very diverse" community. Matthew has his own bedroom and a play area with age-appropriate toys for him. The family has a family dog that shows no signs of aggression. Arsola explained that Matthew loves to be held by his foster parents, and he likes their comfort and enjoys their company. Matthew does not cry, and he appears to be very fond of his foster mother. According to Arsola, Matthew reaches

8

for his foster mother, he wants to be around her, and he is always smiling when he is with his foster parents.

Arsola testified that Matthew came into the Department's care because he and Mother tested positive for methamphetamines when Matthew was born in December 2020. According to Arsola, Mother has a concerning criminal history of drug possession and history with the Department. In 2005, the Department received a referral of physical abuse after Mother tested positive for cocaine, methamphetamines, benzopienes, and PCP when her daughter Amy was born. Amy and her older sister, Zoe, were taken into care and Mother's parental rights to both girls were later terminated. Amy was adopted and Zoe's maternal grandmother was appointed as her permanent managing conservator.

Arsola testified that Mother had not successfully completed her family service plan. According to Arsola, Mother did not provide the Department with proof of housing and employment, and she did not complete her psychosocial evaluation or attend an approved parenting class. Mother also had not submitted to any random drug tests, despite multiple requests to do so. Mother did not complete another drug assessment after being discharged from a substance abuse program in May 2021 for failure to comply with the program. Arsola testified she asked Mother to submit to court-ordered drug testing and discussed the drug testing requirement and family service plan with Mother the seven times they met during the pendency of the case.

9

Arsola further testified that Mother did not take a September 2021 court-ordered drug test.

With respect to possible kinship placements, Arsola explained that Mother and Father had suggested several placements, but none of them were suitable. Arsola testified that Anita Williams ("Williams"), Mother's sister, was not approved because the Department's initial investigation revealed that Williams had a recent history with APS due to allegations that she physically abused and exploited an elderly person. The Department also requested a home study for Jerry Fuqua, a family friend.[5] Although Fuqua's home study was approved pending a backup caretaker, she withdrew herself from consideration because Mother had asked her several times to name Williams as the backup caretaker and Fuqua did not want anything to do with Williams.

Mother proposed her daughter Zoe as a possible placement. Arsola testified that Zoe, a recent college graduate, was in the process of moving to Dallas and she was not willing to move forward with the process at that time. Zoe told the Department she would contact when and if she decided to move forward with the process of becoming a caretaker for Matthew. Zoe, however, never contacted the Department after she relocated to Dallas.

---

[5]     Although the clerk's record indicates that Ms. Fuqua's given name is likely "Jenny," she is identified as "Jerry" in the reporter's record.

Mother also proposed her sister Chasta as a possible placement. According to Arsola, the Department did not request a home study for Chasta initially because Chasta and Mother were living at the same address. The Department, however, requested a home study for Chasta after the court ordered the Department to do so. Arsola testified that the Department was not was able to complete a home study because Chasta was difficult to contact and not very cooperative with the Department's multiple efforts to schedule a home study.

Arsola testified that it is in Matthew's best interest to be placed in a safe, stable, drug-free home. She testified that given Mother's "continuous history with substance abuse" and the lack of information she had with respect to Mother's current living situation, she did not believe Mother would be able to provide Matthew with the home environment he needed. Arsola opined that it was in Matthew's best interest to be adopted by his foster parents. Arsola explained that the Department wanted permanency for Matthew and "so we want him to be able to be adopted to achieve that permanency so he can grow up in a drug free stable environment." Arsola asked the court to terminate Mother's parental rights to Matthew on several grounds, including her failure to complete her court-ordered family service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(O) (allowing trial court to order termination of parent-child relationship if court finds by clear and

11

convincing evidence that parent failed to comply with court-ordered family service plan).[6]

On cross-examination, Arsola agreed that Williams disputed the allegations against her in the APS case. Arsola testified that while Mother gave her a parenting certificate, the program was not acceptable to the Department. She explained that the Department requires a six- to eight-hour program that addresses the needs of a child and the certificate Mother presented was for a "coping and divorce program." Arsola also testified that the night prior to trial, she received some attendance sheets from Mother showing she had attended AA and NA meetings. Arsola acknowledged that Mother attended her two-hour biweekly visits with Matthew, but she noted that Matthew does not appear to know who Mother is because he cries "almost

_____

[6] Arsola also asked that Mother's parental rights to Matthew be terminated under Family Code Sections 161.001(b)(1)(D), (E), (P), and (R). *See* TEX. FAM. CODE § 161.001(b)(1)(D) (allowing termination of parent-child relationship if court finds by clear and convincing evidence that parent knowingly placed or knowingly allowed child to remain in conditions or surroundings which endangered child's physical or emotional well-being); *id.* at § 161.001(b)(1)(E) (allowing termination if court finds by clear and convincing evidence that parent engaged in conduct or knowingly placed child with persons who engaged in conduct which endangered child's physical or emotional well-being); *id.* at § 161.001(b)(1)(P) (allowing termination if court finds by clear and convincing evidence that parent used controlled substance "in a manner that endangered the health or safety of the child" and "failed to complete a court-ordered substance abuse treatment program" or continued to abuse controlled substance after completing such program); *id.* at § 161.001(b)(1)(R) (allowing termination if court finds by clear and convincing evidence that parent was "the cause of the child being born addicted to alcohol or a controlled substance, other than a controlled substance legally obtained by prescription").

throughout the whole visit." She testified Mother soothes Matthew appropriately and brings appropriate toys for Matthew to her visits.

## B. Foster Mother's Testimony

Matthew's foster mother ("Foster Mother") testified that Matthew came to live with her and her husband on December 8, 2020. She testified that although Matthew had a slight shudder and would shake for a few seconds multiple times a day, the shudder diminished over time and stopped when he was two weeks old. Matthew's pediatrician thought the shuttering was caused by Mother's drug use, but the doctor did not have any concerns about Matthew going forward. Foster Mother is a teacher, and her husband an IT professional. Although they do not have any other children, Foster Mother testified they have lots of family in the area, including their immediate family.

Foster Mother testified Matthew attends the preschool at her and her husband's church four days a week and that he loves to play guitar and piano. Foster Mother stated she intends for Matthew to graduate from high school and attend a four-year university like she and her husband did. Foster Mother confirmed she and her husband have the financial resources to meet Matthew's needs now and in the future. She further confirmed that she and her husband were absolutely willing to adopt Matthew: "I love him. I completely with my whole heart love this child." She

acknowledged she did not have contact with Matthew's siblings but if she could get the contact information, she would be happy to establish contact.

## C.    Father's Testimony

Relevant to Mother's appeal, Father testified he had known Mother for four or five years. Although they had been in a relationship for a few years, they were not in one at the time of trial. They were, however, still in contact. When asked when he and Mother last used drugs together, Father testified he had no idea. And when asked what drug they last used together, Father stated he and Mother never used drugs together. He stated that in the last five years, he only used alcohol.

## D.    Mother's Testimony

Mother testified last. She testified she believed she had completed all of the services she was asked to complete in her family service plan. Mother stated that she is employed as a babysitter and although she does not have any "pay stubs," she has "notes" that she gave to the caseworker the day prior to trial. She also provided the address of her current residence. Mother admitted she had not completed a psychosocial evaluation and claimed she had one scheduled the following week. She testified that she provided the caseworker with a parenting certificate and the parenting class discussed the needs of a child. Mother did not have the Department's list of approved programs, but she believed that the parenting class she attended was approved because "it said it was a court approved, that it was a class for parenting."

When asked about her compliance with the family service plan's drug testing requirements, Mother responded that Arsola only contacted her regarding visits with Matthew and she never contacted Mother about taking a drug test. Mother explained that she did not appear for any drug tests because she was not aware of them and was never given an address for the testing location. Mother later testified she believed she showed up for the drugs tests she knew about and understood she was required to attend and that any failure to complete drug testing on her part was because she did not have the information and was not provided notice. When asked specifically about the February 2021 drug test she missed, Mother could not recall why she failed to test. With respect to the court-ordered test in September 2021, Mother explained that no one contacted her about a September test, and she believed that she "wasn't supposed to do it."

Mother was also asked about the substance abuse program from which she was discharged in May 2021. She testified that she attended every day, she never missed a class, and she did not understand why she was discharged. She suggested she might have been discharged from the program because her journal entries were insufficient. Mother stated that the day before trial, she gave Arsola sign-in sheets from the NA and AA meetings she had attended. Mother also testified she attended the meetings once or twice a week and that she had completed more than the 90 hours she was required to attend. Mother testified she has been clean since she left

the hospital on December 6, 2020. She stated methamphetamines were the only drugs she used, and she did not spend money on drugs.

With respect to possible kinship placements, Mother testified she had been asking the court since December to place Matthew with a family member until her service plan was completed. Mother claimed she received a letter from the Department in August 2021 in which it apologized for not having the family reunification done the way it was supposed to be completed by the Department's policy. She stated that her sister Chasta had contacted the Department about a home study, but the home study had to be rescheduled because Chasta's son was not home at the time. Mother testified that Chasta told her that "she's never had to reschedule." When asked if Chasta had been trying to get in touch with the Department, Mother stated, "Yes. She's the one that wanted a home study."

On cross-examination, Mother was asked about the 2005 case that resulted in the termination of her parental rights for her daughters, Amy and Zoe. Mother testified that her rights were terminated in 2006 after she executed an irrevocable affidavit of relinquishment. Although she denied that her rights to her daughters were terminated because of drug use, Mother acknowledged that the 2005 case was initiated because of her drug use.

Mother acknowledged that she was involved with the Department again later because she and her youngest child, Matthew, tested positive for drugs when

16

Matthew was born. Mother admitted she had not appeared for all court-ordered and Department-requested drug tests and had no evidence supporting her claim she had been sober for almost a year. Mother acknowledged that the best way to demonstrate her sobriety was through drug testing. Although she denied meeting with Arsola every month, Mother admitted she and Arsola had spoken about her visits and they went over the family service plan. Mother testified that she attended all court hearings she was available to attend, and she did not attend the first hearing because she was not given the correct time.

On December 8, 2021, the trial court signed a decree naming the Department as Matthew's sole managing conservator and terminating Mother's parental rights to Matthew pursuant to Texas Family Code Sections 161.001(b)(1)(O) and (P).[7] *See* TEX. FAM. CODE § 161.001(b)(1)(O) (allowing trial court to order termination of parent-child relationship if court finds by clear and convincing evidence that parent failed to comply with family service plan); *id.* at § 161.001(b)(1)(P) (allowing trial court to order termination of parent-child relationship if court finds by clear and convincing evidence that parent used controlled substance "in a manner that endangered the health or safety of the child" and "failed to complete a court-ordered

---

[7] The trial court also terminated Father's parental rights to Matthew, but unlike Mother, Father is not appealing the termination decree.

17

substance abuse treatment program" or continued to abuse controlled substance after completing such program).  This appeal followed.

**Standard of Review**

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights."  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted).  Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent.  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a termination case filed under Texas Family Code Section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child.  TEX. FAM. CODE § 161.001(b).

Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 3612 (Tex. 2003).

When conducting a factual sufficiency review in a termination case, we must consider the entire record. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We assume that the factfinder resolved disputed evidence in favor of its finding if a reasonable factfinder could do so, but we cannot disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *See In re Commitment of Stoddard*, 619 S.W.3d at 674. Rather, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

**Best Interest of Child**

In her sole issue, Mother argues there is factually insufficient evidence supporting the trial court's finding that termination of her parental rights was in

19

Matthew's best interest.  *See* TEX. FAM. CODE § 161.001(b)(2).  Mother concedes there is legally and factually sufficient evidence supporting the trial court's finding that she did not complete her family service plan and legally sufficient evidence that termination is in Matthew's best interest.[8]

Mother, who acknowledges that "it is clearly in [Matthew's] best interest for him to remain" with his foster parents, does not argue that Matthew should have been returned to her care.  Rather, Mother argues that there is not factually sufficient evidence that terminating her parental rights is in Matthew's best interest because permanency can also be "achieved through [managing] conservatorship without adoption" given that one of Matthew's family members may be able care for him.  She also argues that termination is not warranted given her "willingness to parent" because she "visited her child while in CPA care, her visits were appropriate, and she soothed the child when he cried."  Mother acknowledges that "placement with family is secondary to the issue of termination of [her] parental rights," and she

---

[8]     Mother does not address the sufficiency of the evidence with respect to the trial court's finding that she committed the predicate act set forth in Texas Family Code Section 161.001(b)(1)(P).  TEX. FAM. CODE §161.001(b)(1)(P) (allowing trial court to order termination of parent-child relationship if court finds by clear and convincing evidence that parent used controlled substance "in a manner that endangered the health or safety of the child" and "failed to complete a court-ordered substance abuse treatment program" or continued to abuse controlled substance after completing such program); *see generally In re A.V.*, 113 S.W.3d 355, 3612 (Tex. 2003) (holding only one predicate finding under section 161.001(b)(1) is necessary to support judgment of termination when there is also finding that termination is in child's best interest).

argues the Department's plan to have Matthew adopted by his foster parents, as opposed to a family member, is an important component of the best-interest analysis because "sometimes issues of termination and conservatorship overlap."

## A.    Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct.  *In re A.V.*, 113 S.W.3d at 361.  There is a strong presumption that the best interest of a child is served by keeping the child with a parent.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  But there is also a presumption that the permanent placement of a child in a safe environment is in the child's best interest.  TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting that child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking

21

custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We may also consider the statutory factors set forth in Texas Family Code Section 263.307, including: (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

This list of factors is not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best

22

interest. *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well direct evidence when conducting a best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.).

**B.    Analysis**

Multiple factors support the trial court's finding that termination of Mother's parental rights was in Matthew's best interest, including her failure to maintain a safe and stable home during the pendency of the case, her prior drug use coupled with her failure to submit to drug testing, and her undisputed failure to comply with her family service plan. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child.").

23

The child's need for a permanent home has been "recognized as the paramount consideration in a best interest determination." *In re B.J.C.*, 495 S.W.3d at 39 (noting that child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination) (citing *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.)). The record reflects that Mother was homeless when the case began, and the Department expressed concerns about Mother's ability to provide Matthew with a safe, stable, and drug-free home from the time Matthew was taken into care. Mother admitted she did not have a stable residence when she first spoke to the Department and that she would move in with one of her sisters from time to time. Although Mother provided her current address when she testified at trial, Arsola also testified that she did not know where Mother was living and thus could not evaluate whether Mother's home was stable and safe. The record also reflects Mother failed to provide the Department with verifiable proof of her employment during the pendency of the case, such as pay stubs, as required by her service plan. Mother's failure to maintain regular employment and suitable housing that was clean, stable, and free from safety hazards during the pendency of the case, not only violated the terms of the family service plan but also supports the trial court's best-interest finding. *See Holley*, 544 S.W.2d at 372 (recognizing stability of home and ability to provide for child's current and future physical and emotional needs as best-interest factors); *see also In re C.H.*, 89

24

S.W.3d at 28 (stating evidence supporting the trial court's finding that mother failed to complete her family service plan also support finding that termination is in child's best interest).

The evidence also reflects that Matthew's foster parents have been able to meet all of his physical and emotional needs. Foster Mother confirmed that she and her husband have the financial resources to continue to meet Matthew's needs in the future. According to Arsola, the foster parents' home is in a nice and "very diverse" community. Matthew has his own bedroom, a play area with age-appropriate toys, and he attends preschool at the family's church. Matthew, who has lived with his foster parents all of his life, is healthy and meeting all his developmental milestones. *See Holley*, 544 S.W.2d at 372 (recognizing child's present and future physical and emotional needs, parental abilities of persons seeking custody, and stability of home or proposed placement as best-interest factors). Matthew's foster parents are college-educated professionals and they want Matthew to attain the same level of education. *See id.* (recognizing plans for child by individuals or agency seeking custody as best-interest factor).

"When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *see also In re N.J.H.*, 575

S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (stating evidence young child had bonded with foster family supported best-interest finding); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at \*20 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.) ("A child's bonding with her foster family implies that the child's desires would be fulfilled by adoption by the foster family."). Matthew has spent at most four hours a month with Mother and according to Arsola, Matthew spent most of that time crying, and he did not appear to know who Mother was. Aside from the fact that Mother regularly visited with Matthew, brought him age-appropriate toys, and tried to soothe him when he cried, there is no evidence that Matthew was bonded with Mother or wanted to be with her. Unlike with Mother, there is substantial evidence that Matthew is well bonded with his foster parents who love him and want to adopt him. According to Arsola, Matthew smiles at his foster parents and he enjoys being with them and held by them. Matthew also shows a particular affinity for Foster Mother. According to Arsola, Matthew reaches for her, he wants to be around her, and he is always smiling when he is with his foster parents. This evidence supports the trial court's finding that termination of Mother's parental rights was in Matthew's best interest. *See In re N.J.H.*, 575 S.W.3d at 834; *see also In re J.D.*, 436 S.W.3d at 118.

Matthew's young age alone also weighs in favor of the trial court's finding that termination of Mother's parental rights was in his best interest. *See In re J.M.T.*,

26

519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that young age of child—fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest); *see also In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969 *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (mem. op.) (stating children's young ages—five and six years old— rendered them "vulnerable if left in the custody of a parent unable or unwilling to protect them or to attend to their needs").

The record also reflects that Mother tested positive for cocaine, amphetamines, benzodiazepines, and PCP when her daughter Amy was born in 2005, which resulted in her parental rights being terminated as to Amy and her older sister, Zoe. Mother also used drugs when she was pregnant with Matthew in 2020, thus risking losing her rights to him as well. When a parent is under a court order to drug test and fails to submit to such testing, a trier of fact may conclude that the parent refused to do so because of continuing drug use. *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (refusal to give hair sample permitted court to infer father refused testing because it would be positive); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding fact finder could infer that parent's failure to submit to court-ordered drug testing indicated parent was avoiding testing because they were using narcotics). Mother tested positive for illegal drugs in December 2020, and she failed to attend

any of the drug screenings scheduled during the pendency of the underlying action. Based on this evidence, the trier of fact could reasonably have concluded that Mother continued to use illegal drugs. *See In re J.M.T.*, 519 S.W.3d at 269; *see also In re C.A.B.*, 289 S.W.3d at 885. Although Mother claimed she had been sober since the case began, and only used pain medication right before Matthew's birth to treat a toothache, the trial court could have reasonably disregarded her claims of sobriety, especially given the fact that Mother never took any required drug tests during the pendency of the case and she was discharged from her substance abuse program for non-compliance. *See In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (stating fact finder determines issues of credibility); *see also In re D.M.M.*, No. 14-16-00664-CV, 2017 WL 61847, at *5 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.) ("Continued illegal drug use [by the parent] . . . is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct, and that termination is in the best interest of the child.").

The record also reflects that Mother was convicted of four prior offenses, two of which were for drug possession, and she spent time in jail for all four offenses. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (stating criminal activity that exposes parent to incarceration is conduct that endangers child's physical and emotional well-being); *see also In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule,

28

conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child.").

Mother argues that terminating her parental rights to Matthew is not in his best interest because permanency can also be "achieved through [managing] conservatorship without adoption" given that one of Matthew's family members may be able care for him. Although Mother asked the Department to place Matthew with a family member while the case was pending, and she provided them with names of possible kinship and fictive kin placements, the record reflects that the Department considered these placement options and found that one of the proposed placements was inappropriate, and the others either withdrew their names from consideration, or failed to follow up with the Department's attempts to schedule a home study. On appeal, Mother does not identify any other family members who are available to care for Matthew, much less one that would be an appropriate placement for the child. Furthermore, as the Department points out, none of Matthew's family members testified at trial and there is no evidence demonstrating the appropriateness or availability of any family member to care for Matthew. On the other hand, there is ample evidence that Matthew's foster parents want to adopt him, and they have demonstrated the ability and willingness to meet all of his needs, and provide him with a safe, stable, drug-free environment. *See Holley*, 544 S.W.2d

at 372 (recognizing plans for child by individuals or agency seeking custody as best-interest factor).

Mother also argues that termination of her parental rights to Matthew is not necessary because she is willing to parent Matthew, as demonstrated by the fact that she regularly visited Matthew while he was in the Department's care, the visits were appropriate, she stayed in contact with Matthew's caseworker Arsola, and she attended the court hearings of which she was aware. Mother's willingness to parent Matthew, however, is only one factor in the best-interest analysis and it does not outweigh the considerable evidence establishing termination of her parental rights was in Matthew's best interest.

Viewing the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that that termination of Mother's parental rights was in Matthew's best interest. *In re J.F.C.*, 96 S.W.3d at 266; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

We overrule Mother's sole issue.

## Conclusion

We affirm the trial court's decree of termination.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.